IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HB&G BUILDING PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 2:22-cv-329-ECM |
| | ) | [WO] |
| DIGGER SPECIALTIES INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION and ORDER

### I.  INTRODUCTION

This matter is before the Court on Plaintiff HB&G Building Products, Inc.'s ("Plaintiff" or "HB&G"), renewed motion for a temporary restraining order or, in the alternative, a preliminary injunction, (doc. 7),[1] wherein HB&G seeks to: (1) enjoin Digger Specialties Inc. ("Digger") and Brittain Russell (collectively, "Defendants"), from further use of HB&G's trade secrets and confidential information; (2) require the Defendants to immediately cease use of all computers and/or electronic devices containing HB&G information provided by Russell or otherwise improperly obtained; (3) require the Defendants to return all trade secrets and confidential information to HB&G, including by allowing examination of Digger's and Russell's computers and other electronic devices

---

[1] HB&G also filed an earlier motion for a temporary restraining order or, in the alternative, a preliminary injunction. (Doc. 2).  The renewed motion (doc. 7) is substantially similar to the original motion (doc. 1), except the renewed motion references HB&G's counsel's certification pursuant to Federal Rule of Civil Procedure 65(b).

containing HB&G information by an independent third-party expert; and (4) prohibit Russell from further employment with Digger, before a trial on the merits. (Doc. 7 at 1–2). According to HB&G, Russell is a former HB&G employee who resigned in May 2022 to work for Digger.

HB&G filed this lawsuit on June 1, 2022. (Doc. 1). In its Verified Complaint, HB&G alleges that the Defendants worked together to unlawfully obtain HB&G's trade secrets and confidential information to acquire HB&G's market share. Specifically, HB&G brings claims against the Defendants for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") (Count 1); misappropriation of trade secrets in violation of the Alabama Trade Secrets Act, ALA. CODE § 8-27-3 ("ATSA") (Count 2); and civil conspiracy (Count 4). HB&G also brings claims against Russell for breach of contract (Count 3), breach of fiduciary duty (Count 5), and conversion (Count 7). Finally, HB&G brings a claim against Digger for tortious interference with a contract (Count 6). HB&G seeks compensatory and punitive damages, injunctive relief, and attorney's fees.

For the reasons explained below, the Court concludes that HB&G has demonstrated, at this stage, a likelihood of success on the merits of its misappropriation of trade secrets claims, a likelihood of irreparable injury in the absence of a restraining order issued before the Defendants can be heard in opposition, and that the equities weigh in its favor. Accordingly, HB&G's renewed motion for a temporary restraining order or, in the alternative, a preliminary injunction (doc. 7) is due to be GRANTED to the extent that a

temporary restraining order shall issue as set out further below.  Additionally, the Court will set an evidentiary hearing on HB&G's motion for a preliminary injunction by separate order.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).  Based on the allegations of the Verified Complaint, the Court concludes that it can properly exercise personal jurisdiction over the Defendants and that venue properly lies in the Middle District of Alabama, *see* 28 U.S.C. § 1391.

## III.  FACTS

"When ruling on a [temporary restraining order], 'all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a [temporary restraining order] are taken as true.'" *Alabama v. U.S. Dep't of Com.*, 2021 WL 2668810, at *1 (M.D. Ala. June 29, 2021) (second alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).

HB&G and Digger compete in the outdoor living products industry.  According to the Complaint, HB&G is particularly well-known for its porch columns, and it expends substantial time and resources researching and developing formulas and materials for its columns.  "Some of HB&G's most popular, and most profitable, lines of porch columns are its PermaCast and PermaCast Plus lines, which are made from a proprietary blend of fiber-reinforced polymers." (Doc. 1 at 4).  "HB&G's PermaCast products are manufactured

3

using a chemical process called spin casting, in which resin and fiberglass particles are spun together until the resin is set." (*Id.*).  According to the Complaint, "[c]ompetition in the outdoor living industry is fierce," and HB&G's "investment in its customer relationships, employees, and confidential information is therefore critical to its success." (*Id.*).  Additionally, "columns have historically been a fairly small part of Digger's business, but Digger has been seeking to increase its presence in the columns market." (*Id.*).

Russell previously worked at HB&G as the Head of New Product Development, Architectural Services, and Pultrusion Division.  Russell signed an Employee Confidentiality, Non-Solicitation, and Assignment of Developer's Agreement with HB&G (the "Agreement").  In this agreement, he promised HB&G, among other things, that (1) he would not "use or disclose or divulge to any third party" any HB&G confidential information, except as needed to perform his HB&G responsibilities; (2) he would not "copy, reproduce or remove from the Company" any such confidential information; and (3) he would return all HB&G confidential information immediately upon his separation from the company. (Doc. 1-1 at 2, 4).  Additionally, to keep its sensitive information secret, HB&G's employee handbook instructs all employees about the importance of keeping confidential information secret; it restricts information to employees with a "business need to know"; and it password-protects its electronic systems. (Doc. 1 at 5, paras. 18–19).

While at HB&G, Russell was closely involved in the development and improvement of the PermaCast and PermaCast Plus column lines.  Russell was also closely involved in

HB&G's new SmartColumn technology, which has created huge growth opportunities for HB&G.  In his role, Russell had access to HB&G's most sensitive trade secrets and confidential information.  Specifically, he had access to information on materials, sourcing, operation processes, costs, pricing, strategies, and proprietary column formulas.

In August 2021, Russell began looking for an opportunity to leverage HB&G's confidential information to land a good position and pay from Digger, HB&G's competitor. Russell reached out to Terry O'Connor, who had connections to Digger's executives and whose company worked as Digger's agent to increase sales.  O'Connor then put Russell in touch with Larry Boyts, Digger's Vice President of Sales and Marketing, and asked that Russell in return provide HB&G's list pricing guide and multiplier.  Russell obtained and sent both.  Russell also bragged to O'Connor that he "know[s] where all the gold is buried" and has "a ton of in depth chemistry and mechanical knowledge to share in manufacturing columns." (*Id.* at 10, para. 38).

Russell then began sending to his personal e-mail sensitive and confidential information of HB&G's, including information that Digger could use to improve its own column technology.  Such information included: an Excel file containing "HB&G's revised compositions and 'formulas' needed to make HB&G's columns, including its proprietary PermaCast columns," (*id.* at 11, para. 42); files containing standard costs for all of HB&G's products; and files containing data about changes to HB&G's raw materials costs, which would provide a competitor with information regarding the profitability of HB&G's products.  Russell also downloaded confidential information to a personal USB device.

Throughout the next few months, Russell began meeting with Digger executives. To demonstrate his worth to Digger, Russell began taking more of HB&G's sensitive information to share with executives at these meetings.  For example, in February 2022, Russell met with Boyts and Digger's CEO, Loren "Digger" Graber.  Before the meeting, O'Connor texted Russell several "tips," including: (1) "Provide potential process steps and formulation adjustments that can improve current Column manufacturing"; (2) "Digger Specialties would like to reduce manufacturing costs by 10% or more, improve efficiencies, and produce a better column"; (3) "Openly share the fall-down at HB&G and the direction HB&G is going. Give examples"; (4) "Talk about the resin percentage being too high"; and (5) "Let them know your desire to instill the best manufacturing process, methods, and formulations to be successful." (*Id.* at 13).   According to the Complaint, Russell shared with Boyts and Graber HB&G's confidential information that Russell had sent to his personal e-mail and downloaded to his USB device.  In the three weeks after the meeting, Russell sent to his personal e-mail additional confidential and sensitive HB&G information, including: (1) a spreadsheet containing HB&G's historical column sales data "for each year on a monthly basis from 2005 to 2022"; (2) a spreadsheet containing revenue, cost, and profit calculations for HB&G's latest SmartColumn technology, projected company-wide sales revenues and expenses from 2022 through 2026, projected revenue increases, and projected direct materials costs; (3) a list of contact information for HB&G's key marketing vendors; (4) a document "showing specifications and testing results for one of HB&G's resins, which would provide a competitor with details about the

6

performance specifications of the resins HB&G uses in its column formulations"; and (5) a document containing a "process audit" describing in detail HB&G's resin manufacturing and mixing process. (*Id.* at 14–16, para. 58).   HB&G keeps these files and others like it secret and only within the company.

Russell eventually received a job offer with better pay from Digger.  He used Digger's offer to negotiate a higher salary from HB&G.  HB&G offered Russell a higher salary, which Russell accepted.  Once he accepted, Russell temporarily stopped sending confidential HB&G information to his personal e-mail.  A few weeks later, however, Russell again became frustrated with HB&G and accepted a job offer from Digger.  After accepting this offer, Russell sent even more confidential HB&G information to his personal e-mail.  Russell even asked Digger's Vice President of Operations, Chuck Weldy, what specific information Digger wanted Russell to obtain, to which Weldy responded that he could not "think of anything off the top of [his] head" but that he would "get with [Graber] and see what he's thinking." (*Id.* at 18, paras. 74–75).  On May 4, 2022, Russell, while still employed at HB&G, travelled to North Carolina to meet with Digger's CEO.  After the meeting, Russell texted Weldy: "Teaming up to essentially save the industry by absorbing [HB&G's] mismanaged market share is the clear and righteous path!!" (*Id.* at 18, para. 80).

Russell resigned from HB&G on May 12, 2022. Three days before he resigned, Russell e-mailed more sensitive HB&G material to his personal e-mail, including materials from a meeting between HB&G leadership and a consulting firm it had hired to help lower costs.   Those materials contained confidential information not known to the public,

including information "about the cost improvement projects HB&G is currently pursuing, including, but not limited to, the total hours, columns, and wages HB&G had worked and sold since September 2021, baseline hours spent on each column, plans for improving HB&G's quality assurance program." (*Id.* at 20, para. 82).

After he resigned, Russell refused to return his HB&G laptop for over a week despite receiving multiple requests to do so. Although he eventually returned the laptop, Russell still has not returned the USB drive. HB&G retained Vestigant, LLC to conduct forensic investigations on devices Russell used while employed at HB&G. (Doc. 7-1). Vestigant's investigation revealed, among other things, the e-mails Russell sent to his personal e-mail containing HB&G's confidential files and messages between Russell and Digger executives. (*Id.*).

On May 18, 2022, HB&G sent cease and desist letters to both Russell and Digger. Russell did not respond to HB&G's satisfaction. Digger did not respond.

## IV. DISCUSSION

Federal Rule of Civil Procedure 65 provides that the Court may issue a temporary restraining order without written or oral notice to the adverse party only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

The Court may grant a temporary restraining order if HB&G demonstrates: (1) a substantial likelihood of success on the merits; (2) a likelihood of suffering irreparable injury without the restraining order; (3) that the threatened injury to it outweighs the harm the restraining order would cause the other litigants; and (4) that the restraining order would not be adverse to the public interest. *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001). "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005) (per curiam). A temporary restraining order is an "extraordinary remedy" to which the Court should "pay particular regard for the public consequences" of granting. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008).

### A.  Substantial Likelihood of Success on the Merits

In its motion, HB&G argues that it has a substantial likelihood of success on the merits of its misappropriation of trade secrets claims against both Defendants and its breach of contract claim against Russell. The Court begins with misappropriation of trade secrets.

The DTSA creates a private cause of action for an "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines trade secrets as tangible and intangible "financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices,

formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," if the owner "has taken reasonable measures to keep such information secret" and the information "derives independent economic value . . . from not being generally known." *Id.* § 1839(3).  Prohibited "misappropriation" includes both "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret" without the owner's consent. *Id.* § 1839(5)(A)–(B).  Similarly, the ATSA imposes civil liability upon a person who "discloses or uses the trade secret of another, without a privilege to do so," if, as relevant here:

> (1) That person discovered the trade secret by improper means;
> (2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;
> (3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2).

ALA. CODE § 8-27-3.  The ATSA defines a "trade secret" as information that (1) is "used or intended for use in a trade or business"; (2) is "included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process"; (3) is "not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret"; (4) cannot "be readily ascertained or derived from publicly available information"; (5) is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy"; and (6) "[h]as significant economic value." *Id.* § 8-27-2(1).

10

HB&G alleges that Russell copied and shared with Digger numerous HB&G files and documents containing confidential and sensitive data, including: an Excel file containing "HB&G's revised compositions and 'formulas' needed to make HB&G's columns, including its proprietary PermaCast columns," (doc. 1 at 11, para. 42); files containing standard costs for all of HB&G's products; files containing data about changes to HB&G's raw materials costs, which would provide a competitor with information regarding the profitability of HB&G's products; a spreadsheet containing HB&G's historical column sales data "for each year on a monthly basis from 2005 to 2022"; a spreadsheet containing revenue, cost, and profit calculations for HB&G's latest SmartColumn technology, projected company-wide sales revenues and expenses from 2022 through 2026, projected revenue increases, and projected direct materials costs; a list of contact information for HB&G's key marketing vendors; a document "showing specifications and testing results for one of HB&G's resins, which would provide a competitor with details about the performance specifications of the resins HB&G uses in its column formulations"; and a document containing a "process audit" describing in detail HB&G's resin manufacturing and mixing process. (*Id.* at 14–16, para. 58). Such documents likely constitute trade secrets under both the DTSA and the ATSA. *See* 18 U.S.C. § 1839(3) (trade secrets are "financial, business, scientific, technical, economic, or engineering information, including . . . formulas, designs, prototypes, methods, techniques, processes, [and] procedures"); ALA. CODE § 8-27-2(1); *see also, e.g.*, *Ex parte W.L. Halsey Grocery Co.*, 897 So. 2d 1028, 1034 (Ala. 2004) (holding that documents

"used to forecast sales, to determine what prices should be quoted to certain customers, to create financial statements . . . and to conduct other standard business practices" were trade secrets under the ATSA).

Additionally, HB&G alleges that it took the following steps to keep its information secret: it requires employees like Russell to sign confidentiality agreements; its employee handbook instructs all employees about the importance of keeping confidential information secret; it restricts information to employees with a "business need to know"; and it password-protects its electronic systems. (Doc. 1 at 5, paras. 18–19). Accepting these allegations as true, HB&G has likely taken reasonable steps to keep its information secret. *See* 18 U.S.C. § 1839(3); ALA. CODE § 8-27-2(1) *see also S. Field Maint. & Fabrication LLC v. Killough*, 2018 WL 4701782, at *6 (M.D. Ala. Oct. 1, 2018) (concluding that instructing employees on confidentiality and marking documents confidential were "reasonable" secrecy measures under the DTSA and the ATSA).[2]  The Court also finds that HB&G has established that the information likely cannot "be readily ascertained or derived from publicly available information" and has "significant economic value" for purposes of the ATSA, *see* ALA. CODE § 8-27-2(1), and that the information "derives independent economic value . . . from not being generally known" for purposes of the DTSA, *see* 18 U.S.C. § 1839(3).

---

[2] While the Court acknowledges that *Killough* is nonbinding, the Court finds its analysis persuasive.

12

Finally, pursuant to the Agreement, Russell promised HB&G that (1) he would not "use or disclose or divulge to any third party" any HB&G confidential information, except as needed to perform his HB&G responsibilities; (2) he would not "copy, reproduce or remove from the Company" any such confidential information; and (3) he would return all HB&G confidential information immediately upon his separation from the company. (Doc. 1-1 at 2, 4).  As stated above, HB&G alleges that Russell surreptitiously obtained large amounts of HB&G's confidential information and shared that information with Digger. Additionally, HB&G alleges that Digger knew that the information Russell was taking belonged to HB&G and was confidential, but Digger nevertheless approved and directed Russell's actions so that Digger could better compete with HB&G.  Based on these allegations, HB&G has shown at this stage that the Defendants likely acquired HB&G's trade secrets by improper means. *See* 18 U.S.C. § 1839(5)(A)–(B); ALA. CODE § 8-27-3; *cf. Priority Payment Sys., LLC v. Signapay, LTD*, 161 F. Supp. 3d 1294, 1301–02 (N.D. Ga. 2016) (analyzing claim under the Georgia Trade Secrets Act, which is similar to the DTSA and the ATSA, and finding that preliminary injunction was warranted where former employee engaged in misappropriation by sending confidential information to his personal e-mail while communicating and working "in tandem with" a company that wanted access to that information).

Taking as true the Verified Complaint's factual allegations and the declaration filed in support of the motion for a temporary restraining order, the Court finds that HB&G has demonstrated a substantial likelihood of success on the merits of its misappropriation of

13

trade secrets claims under the DTSA and the ATSA. Because the Court has determined that HB&G has a substantial likelihood of success on the merits of its misappropriation of trade secrets claims, the Court pretermits any discussion of the substantial likelihood of success on HB&G's remaining claims. *See Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1384 (M.D. Fla. 2005) ("To obtain temporary injunctive relief, [a party] must show a substantial likelihood of success on at least one claim."), *aff'd*, 403 F.3d 1223 (11th Cir. 2005); *Sapphire Consulting Servs. LLC v. Anderson*, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12, 2021) ("When a plaintiff asserts multiple claims as a basis for a preliminary injunction, the plaintiff 'need only establish a substantial likelihood of success on one claim.'" (citation omitted)).

## B. Irreparable Injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). HB&G argues that it faces a likelihood of irreparable injury absent a temporary restraining order because damages cannot adequately compensate for the loss of a trade secret. Based on the nonbinding but persuasive authority from other federal courts, including district courts in the Eleventh Circuit, the Court concludes that HB&G's injury attributable to the Defendants' disclosure and use of HB&G's trade secrets cannot be undone through monetary remedies alone and thus constitutes irreparable injury. If the Defendants are not enjoined from using the confidential information they improperly obtained from HB&G, HB&G stands to lose its competitive market advantage and

14

customer base. *Cf. N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (analyzing misappropriation of trade secrets claim under New York law and concluding that the plaintiff demonstrated irreparable harm, explaining that the "loss of trade secrets cannot be measured in money damages" because "[a] trade secret once lost is, of course, lost forever" (alteration in original) (citation omitted)); *Priority Payment Sys.*, 161 F. Supp. 3d at 1303 (finding that if the defendants were permitted to complete any work on a system that incorporated the plaintiffs' trade secrets, the plaintiffs' "competitive market advantage and customer base from its advanced software system would be diluted," and damages would be an inadequate remedy); *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1363 (S.D. Fla. 2012) (analyzing misappropriation of trade secrets claim under the Florida Uniform Trade Secrets Act, which is similar to the DTSA and the ATSA, and concluding that a former employee's possession of "confidential information regarding contract structures, pricing points, marketing strategies, and customer management" posed irreparable harm, including because the plaintiff's "reputation for maintaining its clients' confidentiality would be tarnished" and "competitors could [use that information to] underbid" the plaintiff); *Marine Turbo Eng'g, Ltd. v. Turbocharter Servs. Worldwide, LLC*, 2011 WL 6754058, at *10 (S.D. Fla. Dec. 22, 2011) (finding that the harm caused by trade secret misappropriation "is clearly an injury, which is not easily quantifiable in monetary terms").

Based on the facts alleged in the Verified Complaint and the persuasive authority cited above, the Court concludes that HB&G has shown it will likely be irreparably injured

absent a restraining order.  Additionally, the Court concludes that specific facts in HB&G's Verified Complaint clearly show that irreparable injury will result to HB&G before the Defendants can be heard in opposition. *See* Fed. R. Civ. P. 65(b)(1)(A).

### C.  Balance of Harms

The balance of harms weighs in favor of granting a temporary restraining order.  If a restraining order is not granted, Digger and Russell can immediately begin using HB&G's trade secrets and confidential information to undercut HB&G on price, take away HB&G's customers, and benefit from proprietary research that HB&G shouldered the costs to undergo.  Meanwhile, Digger and Russell face little injury: the information at issue here belongs to HB&G, and so "the harm to [HB&G] outweighs any threat of potential harm to the Defendant[s] from the injunction." *See Truepenny People LLC v. Cota*, 2016 WL 9308534, at *2 (N.D. Fla. Oct. 18, 2016).  Additionally, any harm to Russell "is minimal because the Court is simply requiring [him] to do that which he willingly promised" —*i.e.*, not disclose HB&G's proprietary and confidential information. *See Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1279 (M.D. Fla. 2020).

### D.  Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).  The Court finds that "the public interest is served by protecting trade secrets and enforcing confidentiality agreements." *Freedom Med., Inc.*, 469 F. Supp. 3d at 1279 (citation omitted).  A temporary restraining order here will help

preserve faith in nondisclosure agreements that businesses "routinely make with their employees" to "protect[] trade secrets from unlawful use and disclosure." *Alt. Med. Integration Grp., L.P. v. Langford*, 2013 WL 6195774, at *2 (M.D. Fla. Nov. 19, 2013). While the public benefits from free competition, "free competition must be founded on *fair* competition." *Fortiline, Inc. v. Moody*, 2013 WL 12101142, at *6 (S.D. Fla. Jan. 7, 2013) (emphasis added). "An order enjoining [the] Defendants from unfairly benefiting from [HB&G's] trade secrets affirms sound public policy and incentivizes market players to compete fairly." *See id.* (citation omitted).

### E.  Certification of Counsel

HB&G's counsel has certified in writing that he provided the Defendants notice of HB&G's initial motion for a temporary restraining order or, in the alternative, a preliminary injunction (doc. 2) by sending the motion and the complaint to Digger and Russell both via e-mail and via FedEx to Digger's and Russell's respective addresses. (Doc. 8). HB&G's counsel has also certified that he will send a copy of the renewed motion (doc. 7) to the Defendants via e-mail and via overnight FedEx. (*Id.*). The Court is satisfied with HB&G's counsel's efforts to give notice to the Defendants in accordance with Rule 65(b)(1). Additionally, as explained above, the Court concludes that irreparable injury will result to HB&G before the Defendants can be heard in opposition. *See* Fed. R. Civ. P. 65(b)(1)(A).

### F.  Bond Requirement

Rule 65(c) specifies that the Court "may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs

and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required . . . is a matter within the discretion of the trial court . . . ." *BellSouth Telecomms. v. MCIMetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005) (citation omitted). The Court finds here that, given the short duration of the temporary restraining order and the expedited basis on which the Court will hold a hearing on HB&G's motion for preliminary injunction, a security bond of $5,000 is appropriate. Thus, the Court will require HB&G to post a bond of $5,000. The amount of the bond will be revisited at the time set for the preliminary injunction hearing.

### G. Scope of Restraining Order

Although the Court concludes that HB&G has demonstrated entitlement to a temporary restraining order, the Court declines to issue a restraining order of the breadth HB&G requests. At this early stage, and particularly before the Defendants have had an opportunity to respond, HB&G has not sufficiently demonstrated the need for Digger or Russell to submit their computers and electronic devices for forensic analysis by a third-party expert. The Court is convinced that requiring the Defendants to isolate, sequester, and refrain from accessing any wrongfully obtained information, and to certify with the Court that they have done so, is sufficient to protect all relevant interests at this time. The Court may revisit this issue, if appropriate, at the hearing on the motion for preliminary injunction.

The Court also declines to enjoin Russell from *any* employment at Digger. While Russell may know personally of HB&G's trade secrets, he will be otherwise barred from sharing or acting upon that information in the scope of his employment with Digger. Though Russell signed an agreement not to disclose HB&G's trade secrets, the Court is not convinced that the agreement as provided bars Russell's employment at Digger. If Russell and Digger are otherwise barred from using HB&G's trade secrets, HB&G's potential harm is minimal. At this stage, HB&G has failed to demonstrate entitlement to this particular relief. The Court may revisit this issue, if appropriate, at the hearing on the motion for preliminary injunction.

## V. CONCLUSION

Because HB&G has shown, at this stage, a substantial likelihood of success on its misappropriation of trade secrets claims under the DTSA and the ATSA, a likelihood of irreparable injury in the absence of an injunction before the Defendants can be heard in opposition, and that the equities weight in its favor, HB&G has met its burden of establishing entitlement to a temporary restraining order.

Accordingly, it is

ORDERED as follows:

1. HB&G's renewed motion for a temporary restraining order or, in the alternative, a preliminary injunction, (doc. 7), is GRANTED to the following extent:

   A)   Defendants Russell and Digger, along with Digger's agents, employees, representatives, or anyone acting under Digger's direction or

19

control, are ENJOINED from directly or indirectly accessing, using, relying upon, disseminating, or disclosing HB&G's trade secrets and/or confidential information;

B)   Defendants Russell and Digger, along with Digger's agents, employees, representatives, or anyone acting under Digger's direction or control, are ORDERED to identify, sequester, isolate, and maintain any computers or other electronic equipment that either contains, or may contain, HB&G trade secrets and/or confidential information, and any physical copies of, or copies or documents derived from, such information;

C)   Defendants Russell and Digger, along with Digger's agents, employees, representatives, or anyone acting under Digger's direction or control, are ORDERED to preserve any data, metadata, file usage, and/or file directory information (such as, but not limited to, dates of last access), with regard to HB&G, any trade secret and/or confidential information of HB&G, or any document, email, or other electronic file derived from HB&G's trade secrets and/or confidential information;

D)   Defendants Russell and Digger, along with Digger's agents, employees, representatives, or anyone acting under Digger's direction or control, after isolating the computers, documents, and information as directed in B) and C), are ENJOINED from otherwise using or accessing all computers, documents, and/or electronic equipment containing HB&G

information provided by Russell or otherwise improperly obtained until further order of the Court;

E) Defendants Russell and Digger, along with Digger's agents, employees, representatives, or anyone acting under Digger's direction or control are ORDERED to refrain from any repurposing, deleting, destroying, wiping, or transferring to any other entity, the computers, documents, and/or electronic equipment subject to B), C), or D);

F) Defendants Russell and Digger are ORDERED, three days after service by the Plaintiff of this Order, to certify in writing with the Court that all provisions of this temporary restraining order have been complied with, and to describe the steps undertaken to effectuate that end.

2. This Order is conditioned upon HB&G giving a $5,000 security bond approved by the Clerk of the Court;

3. In accordance with Fed. R. Civ. P. 65, this temporary restraining order will remain in effect for fourteen days from the date of issuance;

4. An evidentiary hearing on HB&G's motion for preliminary injunction will be set by separate order.

The Clerk of the Court is DIRECTED to serve a copy of this Memorandum Opinion and Order on Defendants Digger Specialties Inc. and Brittain Russell by electronic mail to the e-mail addresses provided in the Plaintiff's Certification (doc. 8) and by overnight mail to the physical addresses provided in the Certification (doc. 8).

Done this 3rd day of June, 2022.

                               /s/Emily C. Marks

                               EMILY C. MARKS
                               CHIEF UNITED STATES DISTRICT JUDGE